Assume the parties are still interested in an in-camera argument, is that correct? That's correct. All right. Now, let's inquire as to those of you who are still in the courtroom, would those of you who are with the court and law clerks, please stand up so that we know who you are. And, okay, I see one up. Do either of the parties know and accept the presence of these other people who we don't know? Is it all right with you? Are they with you? They're with each other. Do we need to identify them? In that case, I don't know, but nobody seems to care. Those who are left are acceptable to both of you. All right, then, we shall proceed. This case is number 2012-1542, A10 NETWORKS v. BROCADE COMMUNICATIONS. Good morning, Judge Newman. May it please the Court. There is an interesting and arguably close question presented here about whether A10 acquired the right to sue for infringement that occurred before it acquired the patent that BROCADE is willfully infringing. But the answer to that question, and this is important, bears only on whether A10 is entitled to damages going back to 2007. It has nothing to do with A10's standing as owner to maintain an infringement suit going forward. And because that post-assignment right to enforce the patent... So you had no written assignment expressly granting pre-assignment infringement rights? We had an assignment agreement, the confidential PAA, that sort of set forth the terms of the assignment. The assignment itself, the effective operative document, transferred all rights, title, and interests to the patent. In the future? That's correct. But not in the past? You need a specific assignment or pass rights in order to sue for pass rights. What this Court's cases teach, and they rely on the Morgers v. Marsh decision from the Supreme Court, is that you do need to find evidence of the party's intent to transfer or assign that accrued right to pass damages, because it's not part of the bundle of sticks itself. It's not part of the present patent. We believe that the PAA demonstrates that intent, and that's incorporated into the assignment agreement, or the actual assignment document. But if I may, I would like to begin by talking about 2011 going forward, because I think it's absolutely crystal clear that we have standing going forward from 2011. Can you explain to me what rights ITRI has under the patent assignment agreement? Sure. Under the patent assignment agreement, ITRI retained what amounts to a license back. It has, principally, a right to practice that asset. Are we talking now about paragraph 5.1? We are talking about, yes, 5.1. A non-exclusive, non-transferable, worldwide license. Correct. Which, in effect, puts it in the position of a non-exclusive license. Okay. Now, as a non-exclusive licensee, they're not permitted to sue someone for infringement, right? That is correct. They would not constitute that. They're solely allowed to make use and sell. Correct. So if they were making, using, and selling, say, for example, in California, and somebody competed against them, they would not be able to stop them. Correct. They would have to look to A-10, right? Absolutely. They would have deputized A-10 to protect their rights. That's absolutely right. And not just in the case of affirmatively asserting infringement suits, but also if you look at Article 7. Fighting against the upset of that. Right. Right. Any suit brought by any third party. So does ITRI have itself, I'm not talking about the Ministry, I'm just talking about ITRI, does ITRI have any other rights under the patent license agreement? Only a right to notice in certain circumstances. So notice if A-10 were to assign its rights. Notice if A-10 were to decide it was necessary to sue for infringement a Chinese company. And notice, I believe, in the case of the grant of an exclusive license. Now, are that notice, that provision of providing notice if you're going to sue somebody in China, is that something you typically find in a Chinese agreement? You know, I don't know the answer to that, but it's not at all surprising to me because the Ministry had to sign off on the PAA here. The ITRI funded by... Is A-10 California wholly owned by A-10 Taiwan? I believe it is, yes. A-10 Taiwan. I'm sorry, can you repeat that? There's A-10 California. Right, A-10. And they're wholly owned sub of A-10 Taiwan. That's correct. And A-10 Taiwan is a Chinese company? Correct. And ITRI is an instrumentality of some sort? ITRI is actually organized as a private non-profit corporation, but it was created by a part of the Ministry and two other research institutions, and it is principally funded by and completely controlled by the Taiwan government. So, for purposes of going forward, the title in the PAA is in A-10, isn't it? Correct. A-10 California now, if I recall. Correct. A-10 California. That's right. And so the reservation, the intent of the parties presumably here was to give full right title claim and interest to A-10 Taiwan first and then to have it transferred down. Correct. And so both ITRI and the Ministry, to the extent that the Ministry didn't have any ownership interest in the patent ever, right? That's right. It has just a contingent reversionary interest that this court has held in Primatech II, Valpella, and the McNeill Labs case to be insufficient to defeat any kind of substantiality. You recognize that ITRI has a non-exclusive, non-transferable worldwide license that is nude in that it doesn't even allow it to protect itself. Correct. And the Ministry has certain revisionary rights. They could either nationalize the patent or if they decide for some reason they don't like the way A-10 is using the patent to commercialize, they can grant a license to somebody else. Well, I take issue with that a little bit because it sounds like they could sort of write willy-nilly if they just kind of disagree with what A-10 is doing. But if you look at the special covenants, Article 15, that you're referring to, they track exactly the Taiwan Patent Act, which in turn tracks the considerations that U.S. courts use to decide whether to grant compulsory licenses in certain circumstances. Well, you can track the Taiwan Patent Act. If I found, is the Taiwan Patent Act a public document? It is. The English translation of which is the only thing that I have read because unfortunately I don't speak the native language. So to the extent that the special covenants are verbatim, which you would find in that statute, are we precluded from referring to them in a public opinion? There's a confidentiality agreement here that sort of muzzles us. Right. I understand what you're saying and appreciate that concern. And I think to the extent that the agreement itself recites in Article 15 that the covenants are required by the regulations for the ownership and utilization of the research and development results from the science and technology research and development projects commissioned or subsidized by the Ministry of Economic Affairs or institutions, et cetera, that is a reference to regulations that were issued under the Taiwan Patent Act. But does that mean the act and the regulations require that the patent do retain these rights? I think that they require that the government of Taiwan, if it wants to assign a patent, retain this right. I mean, it's retained sort of inherently under Taiwanese law. I think that even if it were not explicitly spelled out in the special covenant section of the PAA, it would be a fact that the government of Taiwan could, in an emergency circumstance, as it did, as Brocade notes, during the flu outbreak. Does it say emergency in the regulation or the statute? I don't know because I'm not equipped to translate the document for myself. But this is what the whole situation turns on, does it not? Right. So there is another entity that could have the opportunity to come in and harass or whatever? I appreciate the question, though I don't think it actually, this case turns on that because the line this court's case is not drawn. But I thought you were relying on it. You just told us it's actually an act that is obligatory in the contract. That's right. And therefore forget it. No, I'm not saying you should forget it, but I would make two related points. First, that these are interests that the sovereign has to retain consistent with Taiwanese law and that there's no reason to think that they are an escape hatch that would be used sort of willy-nilly. It's kind of a provision for force majeure, as you noted in the McNeill application. Force majeure reversion. Correct. I mean, it's an option. Does it say that or you're saying that? I'm paraphrasing the Patent Act, which is, of course— Is there a force majeure that the entry must be only for security reasons or protection of the government or the national interest? There is language to that effect in the Patent Act, but not in Covenant 15. I'll grant you that the language is broader in Article 15, but I think the important distinction here is that there is no certainty of the reversion, and that's the line that this Court's case has drawn. It's contingent, and so it can't defeat substantiality. And I would mention also here, every single case, every single case, cited by the District Court and by my friend here, involves an exclusive licensing that is trying to prove that it is the effective patentee. It doesn't involve an assignment. Because in the United States, they didn't have the situation to worry about as far as licensing is concerned. And everyone knows the rules and there's extensive precedent on the ground of exclusive licenses. New parties need to be—you tell us this is a special circumstance, which is obligatory in this license because of the laws of Taiwan, the Taiwan Patent Act, and some regulations. And this is the issue, is it not? I think it is a issue. I think that it sort of goes to whether it is true or there's any reason to believe that, a ministry could just sort of render an illusory or eviscerate our rights. But I don't think it answers the question that we have to answer here today, which is, is anything that IPRI or the ministry retaining here defeat the party's clear intent to assign ownership of this patent and everything that goes with it except for— But they didn't assign ownership because they were required, you tell us, by the laws of Taiwan to preserve certain rights to the nation. But they transferred title, Your Honor. I mean, they transferred sole legal title, the right to practice the patent, the sole right to sue for at least present and future infringement subject to the notice requirement I mentioned. I thought you said it's required to reserve certain rights to practice or whatever to the government. There's a license. What IPRI retained, you're correct, is essentially a license back. They're a bare licensee. They have the right, non-transferable, non-exclusive, to practice the patent. That's, I think, completely unremarkable in the case of an owner of a patent who's free to have licensees, bare licensees, exclusive licensees. It doesn't defeat their ownership of the patent. Don't they have the right to grant others licenses on their behalf? We have the unfettered right to grant sub-licenses and licensees. I ask if the Taiwanese government has the right. No, they do not. Is that expressly withheld? No further participation? Well, when they transferred title and all of these other things, they did not reserve a right to sub-license, and I think it is absolutely clear. Who's the they in that sense? I'm sorry. IPRI did not reserve. I think it's important for me to identify what IPRI has and then talk about the ministry. Right. Early on, I thought it was agreed that IPRI, all it has is a non-exclusive, non-transferable license to practice worldwide. That's correct. Period. Period. The ministry has a number of things that are all based on conditions. They're all conditions. The ministry can nationalize, and under certain conditions, the ministry can decide to license the patent, non-exclusive license, to somebody else. Right? Right. Is that a non-exclusive license or is it a... It can only do those things if one of the conditions... It can grant a non-exclusive license. So the ministry has the authority to grant the same kind of license to somebody else that has been granted IPRI here. But it cannot do that unless one of the conditions... Unless certain conditions... I just think it's important to be clear about that. And we've had lots of cases that have situations where there's some contingencies, and the question is, where a patentee was trying to give something to a licensee, was that somehow barring the licensee from being able to sue? Right. Now, am I wrong? The way I see the case, maybe I'm nuts, is that Brocade sued A10 in California, and A10 comes to home, comes home to Taiwan, and says to ITRI, we want to get access to these patents, presumably for some protective device for themselves. Sure. So you have a Chinese company, the patent was created in China with help, it's in Taiwan, you have a Chinese company that actually owned it, that was ITRI, and they, to A10 Taiwan, they say, sure, we'd be very happy to assign you all the right title, claim, and interest of the patent. Right. Under the lay of the land right now, they paid about a million bucks, a million for cash, American, I believe is what it was. That's right. Okay, so the lay of the land now is that it was a schnook. Right. A total schnook, because A10 got nothing. Absolutely nothing. Correct. I mean, when you think about it... So the Chinese company was trying to help another Chinese government, trying to help a Chinese company, stole a million for them and schnook them, because they have, the patents are worth zero. Right. In the hands of A10. That's right. Right now. And it seems to me that if you look at the intent of the parties, which I think is what you're supposed to do when you look at these cases, because there was the intent of the parties, to simply take a million for from a Chinese company and put it in their pocket and give them an assignment that was worthless. Right. I would note in this regard, I completely agree with you, it should be obvious, but Taiwan is fourth among foreign nations and holders of U.S. patents. They are repeat sophisticated players on the international intellectual property market. The idea that what they need to retain as sovereign in case of national emergency, compulsory licensing, things of that nature, would defeat their ability to alienate a patent, it strikes me as a little bit extreme. There's some sort of comedy presumption on our part as well, is there not? That is, don't we presume that at least in the case of governments which are functioning rule of law type governments. Right, this is not a banana republic. Well, I'm not using pejoratives, I'm simply saying, in the normal course of international relations, don't we presume that foreign governments follow their law? Yes. And I think you also have to presume that the ministry would not abuse its rights under the reversionary clause. And if it did, we could take them to court in Taipei. So it's not as if they have this unfettered discretion to just take away what was granted. You're a bit over time. We'll try to save you some rebuttal time. I appreciate it. Thank you. Thank you, Judge Newman, and may it please the court. I'd like to begin with my friend's claim that AITEN has the right to seek past damages. The problem with that is quite basic. As Judge Wallach explains, the right to seek past damages has been held to be separate and distinct from ownership of the patent itself. This court said and enacted, quote, an assignment of the rights of action for past infringements must be expressed and cannot be inferred from the assignment of the patent itself. This Supreme Court and this court have said that many times. I understood your adversary's arrest on the briefs on past damages. It's been our entire argument talking about damages going forward. Yes. Assume you've got us there, Mr. Kidnell. That doesn't do you any good moving forward as it's a separate issue. I disagree, Judge Wallach. That's why I'm starting here, because actually the right to past damages informs the analysis of both questions two and three about all substantial rights as well as the question about Rule 19. So you're saying that the right to past damages is implied as part of the package? No, I'm saying that for purposes of when- It sounds like you're conceding back. No, I'm not conceding back, Your Honor. I think that there are two different inquiries. So, for example, if we concede that if they lose on question one about all substantial rights, and now they're bringing this lawsuit. If, as Brocade has said, we are going to put the invalidity of the patent at issue in this litigation, that could very well impact. It has a very strong risk of impacting Moya and Ittry's rights down the road, because suppose we made the patent invalid in this litigation. Moya and Ittry would then find themselves with nothing. And this court has said, for Rule 19 purposes, that the court has to be very concerned about the rights of absent parties to litigation. There's a very strong risk that this case will determine their rights. Even if there hadn't been a conveyance of the stick having to do with past acts of infringement to the assignee here, if there had been no patent assignment agreement here, if there had just been the assignments, right, then there clearly would be a right to sue for ongoing infringements. If we took out the past? Yes. I think what Judge Watt was trying to get at is to say, yes, we know about the special rules for the bundle of sticks for the past infringement, but if you had an absolutely clean assignment, there was no patent assignment agreement in this case at all, just the assignments, then clearly they could sue for infringement going forward. Well, I'm not quite sure about that, because this court has said in SICOM that an important substantial right is, quote, the exclusive right to sue for all infringements. I understand that, just as a practical matter. If you hold the assignment, it wouldn't have any limitation whatsoever, but you didn't get the bundle of sticks to sue for the past, and you can't with a straight face tell me that would bar you from suing. Yeah, I don't think this court has decided that. I do not argue about that sort of thing. Tell us, were we right in our understanding that ITRI here, at most, has a non-exclusive, non-transferable, worldwide license to make use of itself? No, I think that there's seven different rights that ITRI has, and before I just walk you through those, I just did want to say, Your Honor, in asymmetrics, this court said that the all-substantial rights inquiry is one that's in the aggregation, and so past damages, the failure of past damages, you might be quite right there. By itself, it's not enough. So ITRI has seven rights. The first is the exclusive right to sue for past damages, what we've been talking about. The second is, quote, a permanent, royalty-free, worldwide, non-exclusive license. That's Article 5. Exactly. Article 5. Don't go so fast. Let's be careful. That's what I was talking about. Right, exactly. And then there's things on top of that. The third is, ITRI's prior licenses remain in effect. That's 5.2. Whose prior licenses? ITRI's prior licenses. How do we know that IRTI has any? That's not in the record. Yeah, I'm not sure if it's in the record or not, but the TAA says it's one of the rights. I know it. Those are licenses. We don't have any idea what they are. To the extent, I mean, I think they're burning. You're looking at Paragraph 5, Number 2, correct? And it talks about Party B has entered into licenses, right? Mm-hmm. That's licenses that ITRI has entered into. In summary, we have no idea what they are. And, Your Honor, if we have no idea that that's theirs, the burden falls on them. Under field turf, the all-substantial rights inquiry is one that falls on them, not on us. What kind of licenses are they? Excuse me? What kind of licenses are they? I'm not sure, Your Honor. We're not a party with ITRI, so I don't know. Part of our whole point here is... That's part of the problem. We don't have the real brain. Well, that's exactly your point, that ITRI is an absolute party here, and we're trying to vindicate their rights to the extent we can. But that's a very hard thing to do, obviously. And for time and again, Counsel for 810 has said they'll bring ITRI into the litigation. They'll secure the necessary verbiage. The district court even gave 21 days for them to join ITRI. ITRI has never shown up. Okay. Well, what I was trying to do was to get at the rights that IRTRI has in its own hands. So in its own hands, it has in paragraph 5-1, it has a non-exclusive... It has granted license to somebody else, okay, under 2. That's not a right they have. That's something they gave away to somebody else. Now, so what's... Is there anything else that they have as a source? They have the reversionary rights and the patents, which they can exercise... And where is the reversionary right to them? I think it's 9.3 in articles 10.2. 9.3? That's a default? Yeah. Okay. In 10.2. That's if somebody doesn't pay. Right. And they don't make the payment in order to get it. Right. So if they don't get the payment to get it, they never transfer it. Yes. And then if we could move to MOYA, because that's not a very strong right. I mean, that just... I quite agree. I don't think there's any point. So, but is there any meaningful right? Yes. I mean, both... Counsel for the other side has said that ITRI has the right to sub-licenses, to force sub-licenses, and as well... Wait, wait, wait. Where does ITRI have the right to sub-licenses? You know, we honestly don't have the agreement. We only have their translation. You're making all this talk. And I'm saying that it's their representation at pages three and six of their brief that ITRI has that right to sub-licenses. And maybe I'm wrong. Maybe when they get up on the bottle, they'll say they were wrong. And again, we don't have access to the underlying agreement. I think the most important point here, Judge Clevenger, is this. MOYA, at the very least, has the right to force exclusive licenses as well as nationalization of the patent. They can take the patent over entirely. Now, you just heard my friend on the other side say that this just mirrors the Taiwanese Patent Act. That is an argument they have not made before. It was not made below. And indeed, it's blatantly wrong. If you look at page 34 of our brief, footnote seven, we have the English translation of the Taiwanese Patent Act. It is far more limited. It does not have anything like the Article 15 rights that are at issue here. The Article 15 rights that are issued here say that MOYA has the right to license or indeed take over the patent entirely. It may not. But under certain circumstances. Yeah. And those circumstances, as the district court said, are ones in which, quote, it is undisputed that the PAA gives MOYA the discretion to exercise its rights even over A10's objections. That's at Joint Appendix, page 20. And those certain circumstances, Judge Clevenger, are so vague as this. If A10 has, quote, failed to efficiently utilize the patent. I don't know what failed you. You addressed the intent of the parties of this was to create an illusory assignment. I don't think that's our argument at all. I don't think this is an illusory assignment. I think. It's correct, is it not, that as the matter stands right now, A10 is stymied. It doesn't have the right to enforce the patent. Correct. So they paid a million for an assignment, thinking they were going to get the right to enjoy and own the patent. And it's illusory. It's not worth anything now. I'd say two things about that. Number one, I think it's wrong to say it's illusory and not worth anything. As A10 has said all throughout this litigation, if they can get ITRI and MOYA to be part of the litigation, it would be worth something. It's not easy to move a government. It may not be, but that's part of the terms of the deal when they agreed to it. Indeed, they agreed to these broad sweeping clauses. Now, I wouldn't have agreed to clause 15 of the patent agreement. I'm not sure you would have, but they did. I don't know whether you would have got the license if you didn't agree to it. You might have had to. But be that as it may, I don't think that this court can go and rewrite the agreement or try and find an intent to something that's not in the four corners of the agreement. If I go in and patent a new nuclear weapon, can the United States interject itself in the national defense interest? It could, and it would use its takings power absolutely, and there would be just compensation and any number of restrictions on that. Our whole point is that the Taiwanese Act is nothing like Article 15. Article 15 is so much broader, and indeed it vests the power in MOYA, not in the Taiwanese government as a whole, which is what Article 15 does. And so it's a transfer even within from one Taiwanese agency to another. But our main point is, if you look at the Taiwanese Act and then you look at Article 15, the rights are so different. And this court has never, ever said that you can proceed, particularly when we're talking about the rights of a sovereign, when the party is absent. A123 involved the University of Texas in a fairly similar situation, and this court said, yes, it's really too bad that the litigation couldn't go forward. But that's a cost of, that's a cost of sovereign immunity. I'm not sure I get it. Why are you reciting us to page, footnote 7 on 34? Footnote 7 on 34. There's no text of any act there. Yeah, so this is the Taiwanese Patent Act, page 34 of our brief, and it says that it authorizes agencies to compulsory license... Are you in the text or in the footnote? In the footnote. Which line of the footnote? Probably the fifth line. Compulsory licenses in emergencies, but otherwise only upon request, and predominantly for the supply of the domestic market. And who is translating this patent? I think that's the actual website, the Taiwanese government itself. And if you compare that, as we do at the end of the footnote, to, quote, greatly benefit the country, or other parts of Article 15, like I read to you before, failed to efficiently utilize, this is a massively different right, Judge Clevenger. How do we know that these rights aren't somewhere else embraced in Taiwanese law? Again, I'm not sure whether they are or not. In fact, I would have thought that that would have been a tense burden to show both below first and then before this Court. At field turf, it's very clear that the burden rests on them to show that they have all substantial  And this would be, I think, a very dangerous move for this Court, not just because of the nationalization, which we've been talking about, Judge Clevenger, but also because of the exclusive sub-licensing. This would be the first time, to my knowledge, that the Court would say that in the face of exclusive sub-licensing, that the effect of Article 15 is to remove the ability of A10 to exclusively sub-license. That is, MOYA, and possibly ITRI, if you accept their representations in pages 3 and 6 of their brief, would be able to force licenses on other folks. And our whole point, and this goes all the way back to independent wireless, is that brocade has a right to one litigation and not piecemeal litigation. And if you let this lawsuit go forward, there's a very good risk that ITRI or MOYA in the future could sue brocade based on its own rights in the patent. When you discussed having access to the confidential aspects of the agreement, did the district court have that access? The district court had access to the patent assignment agreement as translated. But there was no counsel only or whatever exceptions for brocade? There was no exception to permit counsel for brocade to view the confidential. We were able to view the English translation, and I believe that is all that the court had before it. And that English translation of the patent assignment agreement was prepared by A10. We have not had access to the underlying Taiwanese language interpretation. In terms of the restrictions on us, you know, we're unrestricted here today, but once the courtroom is open, we're restricted. If you take the opinion that Judge Koh wrote that is available to the public, you take the one we have and look and see what was redacted, and all that was redacted was any reference whatsoever to the patent assignment agreement. So it's that patent agreement that has been carved out. Now, is that a decision that was made between brocade and A10? That is correct. That's right. So the ITRI and the MOYA, as far as we know, don't care. They have never shown up in this litigation. Counsel breaks heads, et cetera. As you well know, from many cases we have, beyond from the International Trade Commission and from the Court of National Trade, frequently there are all kinds of restrictions on us. And when we talk in oral argument, usually those restrictions are waived off so we can write an opinion that the world can understand. The world could not understand Judge Koh's opinion redacted. I understand. It does not make any sense. It's of no precedential value to anybody. Do the parties still maintain that the terms and conditions of the patent assignment agreement are absolutely private and can't be disclosed? I'd be happy to confer with my counsel and get back to you in a letter to the court about that. I assume this is A10's choice of confidentiality. Oh, sorry. I think that we can, as we proceed with our decision, clarify any points to assure that the interests that need to be protected and that have been protected will continue to be. I think that this is, that it was A10, we'll ask counsel for A10, that has requested the confidentiality and you have as, I think you must have agreed. I would like a chance to just confer with my client and make sure that's okay. Well, both of you because our hands are tied. I understand that. And if I could just make one final point about Judge Koh's opinion. I think once it's read in the unsealed full version, I think that it is absolutely manifestly right to say that the right, that Itri and Moya's rights are in serious danger of being compromised. She bent over backwards, gave them 21 days at their own request to bring Itri and Moya into the litigation. They never did. And there's a real danger just as in A123, if this case goes forward, that you will be depriving a sovereign of their rights. Okay. Thank you, Mr. Cottingill. If I may. Ms. McGill, let's restore the full rebuttal time because we should probably squander some of it in connection with the confidentiality. Thank you. I appreciate that. Just to address the confidentiality issue first. You're correct that the agreement at issue is still subject as a party's joint request to a protective order in the district court, which is why we requested an interim proceeding through today. I'm absolutely willing to see if we can do something to modify the protective order, at least to the extent so that you can write an opinion that makes sense to the rest of the world. Will you just give us that provision that says you can modify it as much as you need to make sense of it? Yes. The problem is the PAA. The problem is the PAA. You have the PAA. You have the full English translation of the PAA, which is the only thing in the record. We are. If we encounter any additional difficulties, we'll consult to assure that we preserve whatever you feel needs to be preserved. Great. Thank you very much. Judge Clevenger, I wanted to respond to your question about the pre-existing licenses. There are none with regard to the 491 patent. This is in paragraph 2, 5-2 you're talking about? Yes. So these were the – he made a reference. He said, well, there's obviously here ITI has granted some licenses to somebody else. It hadn't. And that's in our opposition to the motion to dismiss the sealed version at Exhibit 2. There's a declaration that explains that there is one covenant not to sue, and that's against – Where are we going to find that? So you're telling me there is record evidence that tells me that under Article 5-2 there are no licenses outstanding? Correct. And that's part of the district court sealed record that you should have here at the court. It's in our opposition to our motion to dismiss its sealed Exhibit 2. And does the document have a number on it in the – I don't have the site handy, but if the court would like, I could submit a letter after argument directing you to that. A couple of other things. My friend referenced our statement in our opening brief of pages 3 and 6 that sort of lumped IPRI in with the Ministry when we talked about the retained right to sublicense. We were talking about Moa's contingent reversionary interest. We were not talking about any separate right that appears only in the – Was I doing a mistake then? Because the reversionary interest in the Ministry, not in IPRI. That's correct. So I noticed that about 3 and 6, and I didn't know what you were talking about. And in rereading the opening brief, I confess I don't know what we were talking about either, and I apologize for that mistake. This Court has never held, ever, that a reversionary interest that is not certain to occur defeats an assignment. In fact, it's never held that it defeats standing of an exclusive licensee who is only the effective patentee. The only case in which a reversionary interest defeated exclusive licensee's standing was Aspects. And that case distinguished all the rest, distinguished Valpell, Primatech, and McNeil Labs, on the ground that there was a hard termination date. The patent, the entire patent, would revert to the licensor on date X. So I think it's completely distinguishable. The District Court's ruling here said that the most important consideration in determining whether A10 has standing today is whether it received the right to sue for past infringement. My friend suggested that the issue, whether it's relevant to future standings, is unsettled. But I think it's absolutely crystal clear, going back to Moore v. Marsh, and including recent decisions of this Court, like the message phone case that they cite at 16 and 17 of their red briefs, that the failure to acquire the right to sue for the past has no impact whatsoever on whether you have standing going forward. If you take the fact of Moore itself, Moore was the sole owner at the time of infringement, and the Court held his complete sale and transfer of the patent to a third party did not extinguish his claim. The Court also explained that where you have an assignment of the patent, any action for post-assignment damages should join every infringement committed subsequent to the assignment, because that would be, quote, the entire interest. So an accrued claim for past damages simply is not a relevant stick in the bundle of present proprietary rights that you have to care about. The district court completely hinged its analysis to the supposed retention of the right to past infringement. Okay, I think we're out of time, Ms. Newgill, but I believe we have the arguments and solace we can. Thank you. We would ask that you reverse the position. Thank you, and thank you, Mr. Fletcher, for taking such an interesting position. All rise.